Vicki Greene GOLDEN

v.

**STATE BOARD OF LAW EXAMINERS et al.**

Civ. No. K-77-677.

United States District Court, D. Maryland.

March 30, 1978.

Harold Buchman, Baltimore, Md., and Alan B. Morrison, Washington, D. C., for plaintiff.

Francis B. Burch, Atty. Gen., and Diana G. Motz, Asst. Atty. Gen., Baltimore, Md., for defendants.

FRANK A. KAUFMAN, District Judge.

Plaintiff asks this Court to declare unconstitutional and to enjoin enforcement of Rule 10 of the Rules Governing Admission to the Bar of Maryland.[1]  Jurisdiction exists under 28 U.S.C. § 1343(3), the jurisdictional counterpart of 42 U.S.C. § 1983.[2]

On January 18, 1977, Golden, who resides in Washington, D. C.,[3] filed an application for registration as a candidate for admission to the Maryland Bar and a petition to take the Maryland Bar examination scheduled in July 1977.  She received in response a letter from the Secretary of the Maryland State Board of Law Examiners which letter stated, in pertinent part:

> In response to your letter addressed to Mr. Gingerich, Chairman of the State Board of Law Examiners we regret to advise you that we cannot accept your application for registration as a candidate for admission to the bar.
>
> There is no provision in the Rules adopted by the Court of Appeals of Maryland Governing Admission to the Bar which would permit the Board to waive the requirement of domicile in this State as provided in Rule 10.[4]

Rule 10 provides:

*Maryland Domicile Essential*

   a.  *On Application or Petition*

No person shall be entitled to file an application for registration under Rule 2 (Registration of Law Students) or take an examination under Rule 5 (Procedure to Take Bar Examination; Recognition of Law Schools) or retake an examination

---

1. 9A Md.Ann.Code at 675 (1977 Repl.Vol.).

2. The complaint names the Court of Appeals of Maryland and the State Board of Law Examiners, as well as their members, as defendants. While those two entities may not be "persons" within 42 U.S.C. § 1983, there is no need herein to reach the issue of whether or not the jurisdiction of this Court reaches them since only equitable relief is sought and such relief seemingly could be obtained, if plaintiff were entitled to relief herein, against the named individual defendants who are "persons" under section 1983.  Nor is there any need to determine whether any other basis for federal jurisdiction is present.

3. Plaintiff apparently has lived about two hundred and fifty yards from the Maryland line for approximately five years.  Before that, she states that she lived in Maryland for over three years.  Plaintiff presently receives her mail through a post office located in Chevy Chase, Maryland.

4. Plaintiff states that she has been employed in Washington, D. C. as an attorney by the Department of Justice since 1975, that she is fully qualified to take the Maryland Bar examination and that her application to do so has been rejected solely because she is not a Maryland resident.

under Rule 8 (Taking Examination After Failure) unless, at the time of filing the application or taking or retaking the examination, such person is a domiciliary of Maryland.

5. Rule 2 provides:

**Registration of Law Students**

a. *Authority of Board*

The Board shall, upon payment of the fees herein prescribed, accept applications for registration for admission by examination at the times herein set forth under the *nunc pro tunc* power of this Court provided under paragraph (a) of section 3 of Article 10 of the Annotated Code of Maryland (1968 Replacement Volume).

b. *Time of Registration*

Any person enrolled in a law school recognized under Rule 5 (Procedure to Take Bar Examination; Recognition of Law Schools) who desires to become a candidate for admission by examination to the Bar of this State, shall file with the Board, on forms supplied by it, an Application for Registration as a Candidate for Admission to the Bar. If the applicant intends to sit for an examination to be held in the summer, the application shall be filed no later than the first day of August in the year preceding such examination. If the applicant intends to sit for an examination to be held in the winter, the application shall be filed no later than the first day of April in the year preceding such examination. Nothing herein shall prevent an applicant from filing his application at any time after completion of his pre-law studies required by Rule 3 (Pre-Legal Education) for the purpose of ascertaining whether he is eligible to become a candidate for admission to the Bar.

c. *Application—Content*

The application shall consist of two parts each of which shall be executed by the applicant under oath.

1. Part I

Part I shall contain (i) the applicant's full name, age, residence, place of birth and citizenship; (ii) the name of the law school in which the applicant is enrolled or intends to enroll; and (iii) proof satisfactory to the Board that the applicant has complied with the requirements of pre-legal education set forth in Article 10, section 4 of the Annotated Code of Maryland (1968 Replacement Volume) and in Rule 3 (Pre-Legal Education) of these Rules.

2. Part II

Part II shall consist of a Character Questionnaire designed to elicit from the applicant information concerning such of his personal history and previous conduct as may throw light upon his moral character fitness for Bar membership. Part II shall also contain a certificate signed by two reputable residents in the same Judicial Circuit as the applicant,

b. *On Admission*

No person shall be admitted to the Bar of this State unless at the time of admission such person is a domiciliary of Maryland.[5]

certifying to the applicant's good moral character.

d. *Character—Proof*

The applicant shall at all times have the burden of proving his good moral character before the Character Committee, the Board and the Court, and the failure of an applicant to answer any relevant question on the Questionnaire or propounded by any member of the Character Committee, the Board or the Court shall justify a finding that the applicant has not met the burden of proving his good moral character.

e. *Filing Fee*

Every person shall at the time of filing his application pay a fee of Fifty Dollars ($50.00) to the Board.

f. *Late Filing Fee*

With respect to any application filed after August 1, 1970, which is filed later than the time required by section b of this Rule, there shall be paid a fee of Fifty Dollars ($50.00) in addition to the fee prescribed in section e. The late filing fee shall not apply to an applicant who could not have filed at the time required by reason of his not being a *bona fide* resident of Maryland.

g. *Transmission of Application*

After satisfying itself that the applicant's pre-legal educational requirements have been met, the Board shall transmit Part I of his application to the Court and Part II thereof to the Character Committee for the Judicial Circuit in which the applicant resides.

h. *Withdrawal of Application*

An applicant may withdraw as a candidate for admission to the bar, at any time, upon written request to the Board but upon withdrawal there shall be no refund of fees. Rule 5(a) (the other parts of Rule 5 are not pertinent) provides:

**Procedure to Take Bar Examination; Recognition of Law Schools**

a. *Procedure*

After successfully completing the legal education requirements of this Rule, any applicant under Rule 2 (Registration of Law Students), whose application shall not have been withdrawn or revoked under Rule 4 (Character Committees) and who desires to be admitted to the Bar by examination, shall file with the Board at least twenty (20) days before the examination date, a petition under oath on a form to be supplied by the Board stating the petitioner's name and address, that he is a domiciliary of Maryland, and such other information as the Board may require. Attached to the petition shall be a certificate (in

Neither Rule 10 nor any other rule requires that residence exist at any times other than at registration for, and at the time of taking of, the bar exam, and at admission. Nor must an applicant maintain Maryland residency for any extended period of time. Rule 5(a)[6] does, however, require that the applicant be a domiciliary of Maryland twenty days prior to the examination. Golden contends that Rule 10 violates the equal protection clause,[7] the privileges and immunities clauses,[8] and the commerce clause.[9] Defendants seek summary judgment[10] with regard to each of those challenges—challenges which are of a type which have been asserted in our increasingly mobile society within the present decade in a number of cases involving residency requirements of states other than Maryland, for bar examinations and admission to practice law. Most states do have such requirements though they differ substantially in content. The developing case law is most instructive with relation to the three-pronged attack plaintiff mounts herein.

such form as the Board may require) of the Dean or other authorized officer of the law school attended by the petitioner showing that such law school meets the requirements of section b of this Rule and stating that the petitioner has either (i) graduated therefrom (naming the date or (ii) successfully completed the course of study required for graduation and is unqualifiedly eligible for graduation at the next succeeding graduation exercises of such school (naming the date) and that the petitioner, so far as is known, has not been guilty of any criminal or dishonest conduct and is of good moral character. Rule 8(a) and (c) (subsection (b) is not pertinent) provide:

**Taking Examination After Failure—Review Procedures**

  a. *Petition for Retake—Fee*

  After a failure a candidate may take another examination by filing a petition with the Board, on a form issued by the Board, indicating the candidate's desire to take again the bar examination. The petition shall be accompanied with the fee required by Rule 6 (Bar Examination Fee). Such fee shall not be refunded if the candidate does not take the examination; however, the fee retained shall be applied to an examination subsequently taken.

     \*     \*     \*     \*     \*     \*

*Equal Protection*

In *Suffling v. Bondurant*, 339 F.Supp. 257 (D.N.M.), *aff'd mem. sub nom., Rose v. Bondurant*, 409 U.S. 1020, 93 S.Ct. 460, 34 L.Ed.2d 312 (1972), the majority of the three-judge court sustained the constitutionality of a New Mexico rule which prevented persons who had passed the New Mexico Bar exam from being admitted to practice law in New Mexico until they had accumulated a six-month period of New Mexico residency either before, or before and after, the bar exam. The majority of the Court concluded that that rule did not deny equal protection because it allowed the community a reasonable period of time to observe and evaluate the applicant's moral character. Judge Bratton, dissenting, found no valid state purpose. The majority opinion (at 259–60) reviewed a number of cases previously decided with regard to the bar-residency requirements of other states and based its conclusion on its understanding of their teachings:

A state may require its bar members to be of good moral character and fit to

  c. *Deferment of Retake Examination*

  In order to equalize the number of candidates taking the winter and summer examinations, the Board may require candidates filing a petition to retake the examination to defer retaking it until the examination session following the session next after their failure. After three or more failures the Board may condition the retaking of the examination upon the completion by the candidate of specified courses of additional study.

Rule 8, in its entirety, is seemingly without the scope of Golden's challenge, since she does not allege that she has previously taken and failed the Maryland Bar examination.

6. *See* note 5, *supra.*

7. U.S.Const. amend. XIV, § 1.

8. U.S.Const. art. IV, § 2, cl. 1; U.S.Const. amend. XIV, § 1.

9. U.S.Const. art. I, § 8, cl. 3.

10. Defendants' alternative motion for dismissal is inapplicable since the record contains affidavits submitted by plaintiff in addition to the pleadings. *See* Federal Civil Rules 12 and 56. All permissible factual inferences in plaintiff's favor are assumed in the light of the summary judgment posture of this case.

practice their profession. *Schware v. Board of Bar Examiners*, supra. Accordingly, Rule II, subd. A, par. 10 of the Rules Governing Bar Examiners which provides that an applicant for examination must satisfy the Board of his good moral character is not challenged here.

A state may also require that an applicant for admission to the bar be a resident for a reasonable period of time in order that his character and fitness may be examined. *Webster v. Wofford*, 321 F.Supp. 1259 (N.D.Ga.1970).

The question seems to turn on the length of time required to determine good character and to establish residence before admission and whether that length of time is reasonable.

While the regulations require that residence and good moral character be established before taking the bar examination, the Commissioners have allowed the residence period to start at any time before the bar examination with the balance to be filled out after the examination. Residence in New Mexico can start at any time from five months and 29 days before or on the day of the examination with the balance of time to be completed after the examination and good moral character can be established after the examination.

None of the cases in which residency requirements have been held unconstitutional deals with the requirements as liberal as those of New Mexico.

Mississippi required twelve months' residency prior to application to take the examination and further required that a written application be filed at least ninety days before the time of examination. Residency in Mississippi was thus required for a total of fifteen months. *Lipman v. Van Zant*, 329 F.Supp. 391 (N.D. Miss.1971).

Georgia required establishment of good moral character before taking the examination and twelve months' residence after passing the examination prior to admission. · *Webster v. Wofford*, supra. North Carolina required twelve months' residence prior to taking the examination and gave the examination only once each year. *Keenan v. Board of Law Examiners of State of North Carolina*, 317 F.Supp. 1350 (E.D.N.C.1970). In no case was less than one year's residence required and in *Keenan* the time could run as high as two years.

*Potts v. Honorable Justices of Supreme Court of Hawaii*, U.S.D.C. Hawaii, 332 F.Supp. 1392 (1971), dealt with a six months' residency requirement which was held to violate the Equal Protection Clause of the Fourteenth Amendment, but that case is distinguishable. The challenged statute and regulation in *Potts* required that an applicant for the bar examination be a qualified, registered voter and a resident for any six-month period after attaining age fifteen.

Hawaii also fixed a sixty-day registration period prior to the bar examination for the express purpose of enabling the Supreme Court to verify the educational background, morals and character of the applicant. Residency in Hawaii was not required during this sixty-day period. The three-judge court determined that since residency was not required during this period, residency for any six-month period after age fifteen would · not furnish the Supreme Court with facts necessary for an informed judgment as to the applicant's character. The court held that the residency requirements were arbitrary, capricious and unconstitutional but declined to consider whether plaintiff's right to interstate travel or any other constitutional right had been infringed upon.

We conclude that six months' residence in New Mexico to be commenced either any time before the bar examination or as late as the day of the bar examination is a reasonable period in which to afford the Board of Bar Examiners an opportunity to investigate the morals and character of those persons who seek to become members of the New Mexico bar. It also provides a realistic time period in which three members of the bar residing in the applicant's locality can certify regarding his moral character as required by Rule

VI(38) of the Rules Governing Bar Examiners.

Considered under the traditional test of reasonable classification which is the standard we hold applicable, the six-month residency requirement is reasonable and does not unduly penalize petitioners' right to interstate travel. While rejecting application of the stricter test of Equal Protection in this case, *Lipman v. Van Zant,* supra, 329 F.Supp. at page 403, we express the view that a state does have a compelling interest in the quality and integrity of the persons whom it licenses to practice law and may impose regulations which promote that interest.

Judge Bratton, in dissent, wrote (at 260–62):

In *Schware v. Board of Bar Examiners,* 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957), the United States Supreme Court articulated the standard by which this case is governed:

A State cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment. (Citations omitted) A State can require high standards of qualification, such as good moral character or proficiency in its law, before it admits an applicant in the bar, but any qualification must have a rational connection with the applicant's fitness or capacity to practice law. 353 U.S. at 238–239, 77 S.Ct. at 756.

Applying the language of *Schware* to the present case, it is incumbent upon the Board of Bar Examiners to show that the 6 month residency requirement of Rule II, subd. A, par. 8 has a "rational connection" to the State's determination of fitness or capacity to practice law. Because I believe that the Board has failed to meet the burden, I cannot agree with the holding of the majority.

Rule II, subd. A, par. 8 creates two classes of bar applicants: (1) those who, at the time of the bar examination, have resided in New Mexico for 6 months, and (2) those who, at the time of the bar examination, have not been residents for the requisite period. Members of the first class, otherwise qualified, are admitted to the bar immediately upon passing the examination. Members of the second class, otherwise qualified are excluded from membership after passing the examination solely because they have not resided in the state for 6 months. That this is discrimination is not disputed. The question is whether the discrimination is supported by valid reasons. *Schware,* supra at 239, n. 5, 77 S.Ct. 752. If the reasons presented in support of the residency requirement are not valid, the requirement should fail as a violation of the Equal Protection clause.

The Board of Bar Examiners asserts three reasons in support of the residency requirement: (1) The period of residency allows the applicant to become familiar with local customs, governmental structure, rules of procedure and the like; (2) Residence in the state for the 6 month period allows the applicant to establish roots in the community of his choice and indicates an intent on the applicant's part to become a permanent resident; and (3) Residence for 6 months gives the community an opportunity to observe the applicant's moral character, thus facilitating the Board's evaluation of his capacity and fitness to practice law.

The "local custom" theory and the "roots in the community" theory are unpersuasive. Indeed, the majority opinion does not rest its decision on either of these theories. Moreover, all of the cases dealing with residency requirements for admission to the bar have considered these theories and uniformly found them to be without merit. *Keenan v. Board of Law Examiners,* D.C., 317 F.Supp. 1350, 1359–1361 (1970); *Webster v. Wofford,* D.C., 321 F.Supp. 1259, 1261–1262 (1970); *Lipman v. Van Zant,* D.C., 329 F.Supp. 391, 400–401 (1971); *Potts v. Honorable Justices of Supreme Court of Hawaii,* D.C., 332 F.Supp. 1392, 1397–1398 (1971).

The majority opinion rests on the Board's assertion that the period of 6 months residency allows members of the applicant's community to observe his character, thus facilitating the Board's evaluation of the applicant's moral character at the end of the residency period. I disagree with the majority because the post-examination residency period is not contemplated by the Board's own rules for the purpose of evaluation of character.

By the terms of Rule II, subd. A, par. 10, the Board is required to find an applicant to be of good moral character *prior* to the applicant being allowed to take the bar examination. In the face of this rule, the Board's contention that it is necessary to evaluate a non-resident applicant's character by a residency period *after* the examination is untenable. The discrimination perpetrated upon applicants by the post-examination residency rule cannot be justified by an assertion inconsistent with the Board's own rules. To allow the Board such a justification not only furthers a violation of the Equal Protection Clause but also denies these petitioners due process of law.

The inconsistency between the Board's justification of the residency requirement and its own rules renders the classification created by Rule II, subd. A, par. 8 without rational basis. These petitioners are being excluded from the practice of their chosen profession by a rule which violates the Equal Protection Clause of the Fourteenth Amendment. Such an unconstitutional rule should be struck down. [Footnotes omitted.]

In *Lipman v. Van Zant*, 329 F.Supp. 391 (N.D.Miss.1971), cited and discussed in *Suffling*, Judge Keady, for a unanimous three-judge court, held invalid upon equal protection grounds Mississippi's requirement of a one-year residency preceding an application to take the bar examination, writing (at 399, 400–01):

The traditional test for Equal Protection, as long established by the Supreme Court, has been summarized as follows:

"The Equal Protection Clause requires more of a state law than nondiscriminatory application within the class it establishes. * * * It also imposes a requirement of some rationality in the nature of the class singled out. To be sure, the constitutional demand is not a demand that a statute necessarily apply equally to all persons. 'The Constitution does not require things which are different in fact * * * to be treated in law as though they were the same.' * * * Hence, legislation may impose special burdens upon defined classes in order to achieve permissible ends. But the Equal Protection Clause does require that, in defining a class subject to legislation, the distinctions that are drawn have 'some relevance to the purpose for which the classification is made.'" *Rinaldi v. Yeager*, 384 U.S. 305, 308–309, 86 S.Ct. 1497, 1499, 16 L.Ed.2d 577, 580 (1966).

The foregoing test, as applied to bar admission requirements, means:

"A State can require high standards of qualification, such as good moral character or proficiency in its law, before it admits an applicant to the bar, *but any qualification must have a rational connection with the applicant's fitness or capacity to practice law.* * * [Citations omitted; emphasis in original.]

\*     \*     \*     \*     \*     \*

* * * Apparently only two other states, West Virginia and Hawaii, require one-year residency prior to application. Similar requirements in North Carolina and Georgia have already been ruled unconstitutional. As previously noted in *Keenan* [*v. Board of Law Examiners*, 317 F.Supp. 1350 (E.D.N.C.1970)], North Carolina's invalid rule required the applicant be a resident of the state at least 12 months prior to the date of his examination. Georgia's statute, invalidated in *Webster v. Wofford*, 321 F.Supp. 1259 (N.D.Ga.1970, 3-judge court), required a bar applicant, after having passed the state bar examination, to be a Georgia

resident for 12 months preceding the date of admission.

\* \* \* It is urged that the one-year residency requirement (a) encourages the applicant to have a stake in the community and have an interest in his own reputation, (b) enables the applicant to become familiar with local legal practice and the state's governmental structure, and (c) makes possible a more informed judgment as to the applicant's good moral character. We have no hesitancy in concluding that the one-year residency clause does not serve any of these objectives, nor was it designed to promote them. \* \* \*

The Court in *Lipman* reached the opposite conclusion as to the Mississippi rule requiring residency at the time of application. Thus (at 402–03), Judge Keady stated:

Employing the same standard of equal protection, we hold that the portion of § 8654 requiring residence in the state, which is distinctly separate from and independent of the one-year durational period, has a rational connection with an applicant's fitness or capacity to practice law, and hence does not offend the Equal Protection Clause.

As previously noted, the stipulation that an applicant reside in the state when applying for admission to the bar has long existed in many jurisdictions. No doubt a state has the strongest interest in requiring persons seeking admission to its bar to live within its borders. The practice of law is a matter of right only "for one who is qualified by his learning and his moral character." *Baird v. Arizona*, 401 U.S. 1, 91 S.Ct. 702, 27 L.Ed.2d 639, 648 (1971) (Majority opinion). Moreover, as stated by Mr. Justice Blackmun, dissenting, in *Baird v. Arizona* :

" \* \* \* the State, in granting the authority to practice law, with what surely is the true privilege, not the right, to be entrusted with a client's confidences, aspirations, freedom, life itself, property, and the very means of livelihood, demands something more of

the applicant than a formal certificate of completion of a course of legal study and the ability acceptably to answer a series of questions on a Bar examination. It presumably demands what fundamentally is character. *And it is character which a State holds out to the public when it authorizes an applicant to practice law*." (Emphasis added.) 401 U.S. 20, 91 S.Ct. 712, 27 L.Ed.2d 654.

In Mississippi, the reasonable connection of residence with one's professional fitness and capacity is that it allows the defendant Secretary and Board, charged with the duty of investigating the applicant's background, moral character and education, a fair opportunity for personal interviews with the applicant and on-the-ground investigation. Since the bar examination is administered biannually, a nonresident who wishes to apply may wait until shortly before the expiration of the 90-day deadline within which to file his application. Thus, a requirement of residence at date of application does not force any citizen to become a Mississippi resident for a period of time very little more than three months prior to his taking the examination. These are, without doubt, reasonable requirements according to defendants a chance to conduct in each case a meaningful and careful investigation; they are not oppressive to the applicant. Thorough investigation into the character of a bar applicant is imperative if the state is to genuinely represent to the public good character "when it authorizes an applicant to practice law."

Some states, it is true, have dispensed with all residency requirements and routinely conduct out-of-state investigations through national investigatory services, granting authority to their state bar officials to charge greater fees to nonresident applicants to defray the cost of out-of-state, and often distant, investigations. While a uniform plan of this type may be desirable for all states, we fail to see any constitutional bar to Mississippi's requiring the applicant to take up residence within its own borders for a reasonably

short period of time prior to examination, to determine his qualifications. Moreover, under the Mississippi plan, only a small fee is charged every applicant, and the Board has no authority to increase the filing fee of a nonresident applicant to pay the greater expense incident to an out-of-state investigation. These are reasonable and legitimate provisions which impose no burden upon anyone.

Our holding in this regard is directly supported by District Judge Edenfield's opinion in *Webster v. Wofford,* supra:

> "This is not to say that Georgia cannot require a reasonable period of residency prior to taking the bar examination for the purpose of permitting personal interviews and investigation with respect to an applicant's background, moral character and qualifications. The State clearly has a legitimate interest in this area and may adopt reasonable requirements to further that interest. Such requirements, however, should be imposed only to the extent that they are necessary to protect the State's interest. Onerous restrictions are impermissible." 321 F.Supp. at 1262.

In *Keenan,* Circuit Judge Craven's opinion, Note 17, expressly left open a ruling upon the precise issue now before us.[27]

[27] 317 F.Supp. at 1362, Note 17:
> "We express no opinion upon the constitutional validity of rules requiring residency at the time of examination or of admission or upon the validity of short term pre-admission residency requirements designed to insure personal interviews and contact with the applicant."

In *Keenan v. Board of Law Examiners,* 317 F.Supp. 1350 (E.D.N.C.1970), writing for a three-judge court composed of Judges Butler, McMillan and himself, Judge Craven held invalid a North Carolina requirement of at least twelve months' residency prior to bar exam, and wrote (at 1359–60):

> In licensing attorneys there is but one constitutionally permissible state objective: the assurance that the applicant is capable and fit to practice law. * * *

Aside from legal usage and practices, which are mostly learned in active legal practice, we find no rational relationship between "fitness or capacity to practice law" and a knowledge of "local custom." Neither legal competence nor ethical fitness depends upon cultural provincialism. Assuming that knowledge of local government, a permanent stake in the community, and good character are desirable and important qualifications for the competent legal practitioner, we do not agree that one years' [sic] residence is in any way relevant to a determination that these qualities are present in a particular individual.[11] Too often, even lifelong res-

[11] The Florida Supreme Court found "unreasonable" and overturned a state statute requiring two years residency as a prerequisite to taking the state's accountancy examinations. *Mercer v. Hemmings,* 194 So.2d 579 (Fla.1967).
> The regulation of the profession of accounting is an exercise of the police power, for the benefit and protection of the public and is not intended as economic protection for the profession from prospective competitors. Little, if any, reason can be found for requiring a certified public accountant of another state to cease his profession, close his office, and bask in the Florida sunshine for a period of two years before taking the examination. Successful and worthy persons in other states, the kind of citizens we want in Florida, are from a practical standpoint banned from ever becoming Florida Certified Public Accountants. *Id.* at 583–584.

\* \* \* \* \* \*

\* \* \* \* \* \*

idents of a community have no knowledge of even the basic rudiments of the governmental units closest at hand. In our highly mobile society, one who has lived in a particular locale for one year may be firmly rooted in the community or he may be ready to move on tomorrow.

Therefore, while the one year residency requirement may deny licenses to some applicants who lack character or competence, it also bars, arbitrarily and capriciously, applicants who are eminently qualified for admission. Its constitutional infirmity is "over inclusion." [Citations omitted.] It burdens[13] some who,

[13] A one year exclusion from practice is more than a burden, it is sometimes inflicted

as punishment or as a disciplinary measure. *See, e. g., Mackay v. Nesbett*, 285 F.Supp. 498 (1968).

because of unfitness or incompetence, should not be licensed to practice; but it also injures others who are both fit and capable. There are here no exigent circumstances justifying such over inclusion. [Citations omitted.] * * * We recognize the state's interest in admitting only practitioners who are morally and professionally fit, but we find a denial of equal protection of the laws in the Board's presumption that all those who have not been residents of North Carolina for more than one year preceding their bar examination should be classified unfit. "Where there is no rational connection between premise and conclusion, even legislative presumptions must fail." *Wheeler v. Goodman*, 306 F.Supp. 58 (W.D.N.C.1969). [Footnote 12 omitted.]

In *Webster v. Wofford*, 321 F.Supp. 1259 (N.D.Ga.1970), Judge Edenfield, speaking for a three-judge court, held Georgia's twelve-month residency admission requirement unconstitutional for those who had passed the bar. However, Judge Edenfield also wrote (at 1262):

This is not to say that Georgia cannot require a reasonable period of residency prior to taking the bar examination for the purpose of permitting personal interviews and investigation with respect to an applicant's background, moral character and qualifications. The State clearly has a legitimate interest in this area and may adopt reasonable requirements to further that interest. Such requirements, however, should be imposed only to the extent that they are necessary to protect the State's interest. Onerous restrictions are impermissible.[4]

[4] We do not view the expressions of this paragraph to be in conflict with *Keenan, su-*

11. *Keenan* n. 17 is not reprinted here since it appears at p. 1090, *supra*.

12. As to reciprocity arrangements, *see Hawkins v. Moss*, 503 F.2d 1171 (4th Cir. 1974), *cert. denied*, 420 U.S. 928, 95 S.Ct. 1127, 43 L.Ed.2d 400 (1975), in which Judge Russell rejected an equal protection attack upon South Carolina's refusal to admit to practice law in South Carolina a member of the New Jersey bar in the face of New Jersey's failure to grant

*pra*, which held unconstitutional the North Carolina residency requirement *prior to taking* the state bar examination. The requirement in *Keenan* worked an onerous hardship on non-resident bar applicants. * * * [11]

In *Smith v. Davis*, 350 F.Supp. 1225 (S.D. W.Va.1972), also a three-judge case, Judges Field and Hall, with Judge Knapp dissenting, held unconstitutional, in a per curiam opinion, West Virginia's one-year residency requirement for application to the bar. In so doing, the Court noted the *Keenan, Suffling, Webster* and *Potts* decisions discussed or cited *supra* in this opinion or in quotations from opinions included *supra*.

In *Brown v. Supreme Court*, 359 F.Supp. 549, 560 (E.D.Va.), *aff'd mem.*, 414 U.S. 1034, 94 S.Ct. 533, 38 L.Ed.2d 327 (1973), Judges Bryan and Hoffman approved Virginia's residency requirement for bar admission by reciprocity which was different than the residency requirement imposed on those who successfully passed the bar examination. As to the latter, the requirement was that the applicant be a Virginia resident at the time of application to take the exam and also that the applicant state in his application his intention to continue his residency until taking the examination. As to the former, the person must be a Virginia resident and intend so to remain.[12] Judge Merhige, dissenting, found absent a rational basis, for that difference, related to a legitimate state interest. Neither the majority nor the dissenter seemingly questioned Virginia's residency requirement for taking the bar exam. In the course of the majority opinion (at 553), the following statement appears:

Many states adhere to the residency requirement as a condition to admission upon motion without examination.

reciprocal rights to South Carolina attorneys. In *Hawkins*, the District Court had refused to convene a three-judge court on the ground that no substantial federal question was posed. The South Carolina rule involved also seemingly was not of statewide application. Accordingly, the attack upon it apparently did not require the convening of a three-judge court. 503 F.2d at 1175 & n. 3.

Maryland, the home state of Titus, apparently requires a permanent residence, an intention to practice law, and an intention to maintain a law office or teach the profession. * * *

It is to be noted that the residency prerequisites of Maryland and Virginia for taking the bar examination are substantially similar.

The Third Circuit in *Aronson v. Ambrose,* 479 F.2d 75, 77–78 (3d Cir.) (Maris, J.), *cert. denied,* 414 U.S. 1162, 94 S.Ct. 153, 38 L.Ed.2d 103 (1973),[13] held valid a Virgin Islands rule which required bar applicants to be Virgin Islands residents and so to state their intentions at time of application. In *Aronson,* the plaintiffs were Pennsylvania residents and members of the Pennsylvania Bar who intended so to remain. Judge Maris wrote (at 77) that "[t]he requirement that a lawyer must reside in the state in order to practice law there is widely recognized as an appropriate measure to promote the state concern for the proper administration of justice and is in force in most jurisdictions. [Footnote omitted.] * * *" The Third Circuit found it unnecessary, in *Aronson,* to reach the challenge to another Virgin Islands requirement, *i. e.,* of one-year residency before admission to practice law, in view of plaintiffs' stated intention to remain Pennsylvania residents.

An Oregon rule calling upon a person seeking to practice law in that state to be a resident of Oregon at the time of admission, and prior thereto to state his intention to be a resident at time of admission, was held valid by a three-judge court in *Wilson v. Wilson,* 416 F.Supp. 984, 986–88 (D.Ore. 1976), *aff'd mem.,* 430 U.S. 925, 97 S.Ct. 1540, 51 L.Ed.2d 768 (1977). In that case, plaintiff "resides part-time" in Oregon and "part-time" in California and desired "to practice law both in California and Oregon. He has no intention to establish full-time residence in Oregon." *Id.* at 985. "Plain-

tiff has no present intention of closing his California office and residence and becoming a full-time resident of and practitioner in Oregon." *Id.* at 987. In its per curiam opinion, the Court stated (at 987):

It may be that a requirement of Oregon residence on the date of admission would have to be supported by a compelling state interest. Assuming this is so, a state clearly has a compelling state interest in "promoting the speedy and efficient administration of justice in its courts by assuring the competence and discipline of its bar . . ." *Aronson v. Ambrose,* 479 F.2d 75, 77 (3rd Cir. 1973). The requirement that new admittees be state residents at the time of admission is a permissible method by which to promote this compelling state interest. *Aronson, supra,* at 77–78; *Brown v. Supreme Court of Virginia,* 359 F.Supp. 549, 556–59 (E.D.Va.), *aff'd memo.* 414 U.S. 1034, 94 S.Ct. 533, 38 L.Ed.2d 327 (1973); *Suffling v. Bondurant,* 339 F.Supp. 257 (D.N.M.), *aff'd memo.* 409 U.S. 1020, 93 S.Ct. 460, 34 L.Ed.2d 312 (1972).

As far as this Court has been able to ascertain, no court to date has held a residency requirement similar to that under attack in this case invalid under equal protection standards, or for that matter, as is discussed *infra,* for any other reason. In this Court's view, the reasoning which underlies the developing case law as to that single issue is unassailable. Accordingly, Golden's within equal protection challenge may not prevail.

That is so, even though plaintiff, with specific relation to the status of this case at this time, contends that it is not ripe for summary judgment.[14] Plaintiff supports that position by asserting that there are alternate methods to accomplish the same ends as those accomplished by Maryland's

---

13.  No three-judge district court was required because a territorial court was involved. *Aronson,* 479 F.2d at 77 n. 2.

14.  In this case discovery has been suspended by agreement of the parties pending this Court's disposition of defendants' pending summary judgment motion. *See* note 10, *supra.*

Rule 10 without creating discrimination.[15] Furthermore, she contends that Rule 10 has in reality an illegitimate purpose.

■ Defendants do not have to prove that Rule 10 is the only way to accomplish the state's interest. "The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. * * * A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." *McGowan v. Maryland,* 366 U.S. 420, 425–26, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 363 (1961).[16] Nor does that legitimate purpose have to be the primary aim of Rule 10. "[L]egislative solutions must be respected if the 'distinctions drawn have some basis in practical experience,' . . . or if some legitimate state interest is advanced . . . So long as the state purpose upholding a statutory class is legitimate and nonillusory, its lack of primacy is not disqualifying." *McGinnis v. Royster,* 410 U.S. 263, 276, 93 S.Ct. 1055, 1063, 35 L.Ed.2d 282 (1973).[17] In this case, the residency requirement is not of excessive duration, bears a rational relationship to a legitimate state interest, and thus passes muster under equal protection standards. That requirement, in the context of the present record in this case, speaks for itself. Plaintiff cannot alter that result even if she can establish that there are alternative methods which would cause less discrimination than does Maryland's Rule 10. That is so because the level of discrimination created by that Rule does not offend equal protection standards. Accordingly, the within case does not presently lack ripeness for summary judgment on the grounds urged by plaintiff.

### Privileges and Immunities

■ The article IV privileges and immunities clause (U.S.Const. art. IV, § 2, cl. 1) provides:

The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States.

Section 1 of the fourteenth amendment provides in pertinent part:

No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States

. . . .

The practice of law is seemingly not included within either provision. *See In re Lockwood,* 154 U.S. 116, 14 S.Ct. 1082, 38 L.Ed. 929 (1894); *Hawkins v. Moss,* 503 F.2d 1171, 1178–79 (4th Cir. 1974), *cert. denied,* 420 U.S. 928, 95 S.Ct. 1127, 43 L.Ed.2d 400 (1975).[18] In *Hawkins,* Judge Russell wrote (at 1179–80):

The argument that Article IV, § 2 denies to the state any right to enforce a rule such as [South Carolina] Rule 10 is equally without merit. The basic thrust

---

**15.** Plaintiff has submitted an affidavit of the Secretary to the Committee on Admissions to the Bar of the District of Columbia Court of Appeals to the effect that investigations of the characters of applicants can be handled without requiring local residency. The interrogatories plaintiff would press if defendants' summary judgment motion is denied are seemingly aimed at showing that Maryland could reasonably act within the District of Columbia pattern.

**16.** In that case, Mr. Chief Justice Warren, for the majority, upheld Maryland's Sunday closing laws in the face of equal protection and other attacks.

**17.** Mr. Justice Powell, for the majority, rejected an equal protection attack upon a New York statute denying good time jail credit for presentence incarceration and granting it for post-sentence incarceration only. As to developing

equal protection standards, and the validity to be accorded to the choice of the state involved, *see Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976).

**18.** *See* note 12, *supra.* To the same effect as to the privileges and immunities clauses as *Lockwood* and *Hawkins, see Starr v. State Board of Law Examiners,* 159 F.2d 305 (7th Cir.) (per curiam), *cert. denied,* 331 U.S. 830, 67 S.Ct. 1348, 91 L.Ed. 1844 (1947); *Mitchell v. Greenough,* 100 F.2d 184 (9th Cir. 1938), *cert. denied,* 306 U.S. 659, 59 S.Ct. 788, 83 L.Ed. 1056 (1939); *Ricci v. State Board of Law Examiners,* 427 F.Supp. 611, 617 (E.D.Pa.1977); *West Virginia State Bar v. Bostic,* 351 F.Supp. 1118, 1121 (S.D.W.Va.1972); *Mackay v. Nesbett,* 285 F.Supp. 498, 503 (D.Alaska 1968), *aff'd,* 412 F.2d 846 (9th Cir.), *cert. denied,* 396 U.S. 960, 90 S.Ct. 435, 24 L.Ed.2d 425 (1969).

of that section is to prevent "a state from discriminating against citizens of other states in favor of its own", *Hague v. C.I.O.* (1939) 307 U.S. 496, 511 [59 S.Ct. 954, 962, 83 L.Ed. 1423.] So long, then, as the State does not subject the migrant attorney, seeking the right to practice in the State, to no more onerous requirements than those imposed on its own citizens seeking such right, it cannot be said that the State has violated the section.[16] The obligation, from compliance

[16] *See,* for instance, *Doe v. Bolton* (1973) 410 U.S. 179, 200, [93 S.Ct. 739, 751, 35 L.Ed.2d 201] where the residence provision of the Georgia abortion statute was found violative of the "privileges and immunities" provisions of Article IV because it discriminated against non-residents by confining "to its own residents the general medical care available within its borders." In short, it was the preference given the State's own residents that rendered these provisions of the statute void under Article IV, § 2.

Similarly, in *Memorial Hospital v. Maricopa County, supra* [415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974)], the denial of medical supplies essential to life was denied to the migrant who had not lived within the county for at least a year but did not apply to those who had lived more than a year in such county. There was accordingly a clear distinction made between the migrant and the local citizen. In this case, however, the migrant is subjected to no different treatment from that extended to the long-time resident. The only distinction is that between classes of migrants—a distinction made to serve a legitimate state interest. *See, In Re Griffiths, supra* (413 U.S. 717, at 721–722, [93 S.Ct. 2851, 37 L.Ed.2d 910]; *Fales v. Commission on Licensure to Prac. Heal. Art, supra* (275 A.2d 238, at 240).

with which the plaintiff seeks by this action to be excused, is exactly the same obligation imposed indiscriminately by the State, through its Supreme Court, upon its own citizens in the same position as the plaintiff. As we have already pointed out, it is a requirement that is perfectly permissible. * * *

In *Ricci v. State Bd. of Law Examiners,* 427 F.Supp. 611, 617 (E.D.Pa.1977), Judge Higginbotham commented:

[T]he right to practice law in a state court is not a privilege conferred upon a citizen by the United States Constitution or federal statutes. Furthermore, there is no inherent right to practice law in the

state courts until the individual seeking the right to practice has established his or her professional and moral qualifications as proscribed by the state. It is only then that the right to practice law in that state arises. *In Re Lockwood,* 154 U.S. 116, 117, 14 S.Ct. 1082, 38 L.Ed. 929 (1894); *Brooks v. Laws,* 92 U.S.App.D.C. 367, 208 F.2d 18, 28 (1953). Admission to practice in one state is not automatic admission to practice in the courts of another state. *Application of Wasserman,* 240 F.2d 213, 214–215 (9th Cir. 1956). The observation of the Fourth Circuit in *Hawkins v. Mass.* [sic], 503 F.2d 1175–1176, is particularly helpful on this point:

It necessarily follows that licenses to practice law, granted by the courts of one state, have no extraterritorial effect or value and can vest no right in the holder to practice law in another state. To acquire a right to practice in another state one must satisfy the requirements for qualification established by that state.

At best, the privileges and immunities clause would not appear to afford any more protection to a plaintiff such as Golden than do equal protection standards. Thus, in *Toomer v. Witsell,* 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948), Mr. Chief Justice Vinson wrote (at 396, 68 S.Ct. at 1162):

Like many other constitutional provisions, the privileges and immunities clause is not an absolute. It does bar discrimination against citizens of other States where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States. But it does not preclude disparity of treatment in the many situations where there are perfectly valid independent reasons for it. Thus the inquiry in each case must be concerned with whether such reasons do exist and whether the degree of discrimination bears a close relation to them. The inquiry must also, of course, be conducted with due regard for the principle that the States should have

considerable leeway in analyzing local evils and in prescribing appropriate cures. [Footnote omitted.] [19]

*See also Consumers Union v. Albright,* 427 F.Supp. 840, 845–46 (S.D.N.Y.1977) (three-judge court), *appeal filed sub nom., Consumers Union v. Heimann,* 45 U.S.L.W. 3765 (U.S. May 16, 1977) (No. 76–1606); [20] *Kreitzer v. Puerto Rico Cars, Inc.,* 417 F.Supp. 498 (D.P.R.1975) (Toledo, C. J.), *aff'd on other grounds sub nom. Hawes v.*

*Club Ecuestre El Comandante,* 535 F.2d 140 (1st Cir. 1976). [21]

In this case, Golden's privileges and immunities attacks fail for the same reasons as does her equal protection challenge. [22]

### Commerce Clause

■ Golden's contention that Maryland's Rule 10 violates the commerce clause (U.S. Const. art. I, § 8, cl. 3) is equally without

---

**19.** In *Toomer,* the Court (at 403, 68 S.Ct. at 1165) held that there was a violation of article IV, § 2, because "the reasons advanced in support of the statute do not bear a reasonable relationship to the high degree of discrimination practiced upon citizens of other States * * *."

**20.** In *Consumers Union,* Judge Gagliardi wrote (at 845):

The [amend. 14, § 1, privileges and immunities] clause protects from state infringement rights of national citizenship as distinct from the fundamental or natural rights inherent in state citizenship. *Madden v. Kentucky,* 309 U.S. 83, 90–91, 60 S.Ct. 406, 84 L.Ed. 590 (1940); *see Snowden v. Hughes,* 321 U.S. 1, 6–7, 64 S.Ct. 397, 88 L.Ed. 497 (1944). Those rights of national citizenship arise "out of the nature and essential character of the national government, and [are] granted or secured by the constitution of the United States." *Madden v. Kentucky, supra,* 309 U.S. at 92 n.21, 60 S.Ct. [406] at 410 n. 21, quoting *In re Kemmler,* 136 U.S. 436, 448, 10 S.Ct. 930, 34 L.Ed. 519 (1890). The ability to purchase [savings bank life insurance] is in no way such a right of national citizenship. *See Hawkins v. Moss,* 503 F.2d 1171, 1178–79 (4th Cir. 1974), *cert. denied,* 420 U.S. 928, 95 S.Ct. 1127, 43 L.Ed.2d 400 (1975). * * *

Turning to the second privileges and immunities challenge, Art. IV, § 2, cl. 1 of the Constitution provides:

The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States.

Generally, this clause was intended "to help fuse into one Nation a collection of independent, sovereign States." *Toomer v. Witsell,* 334 U.S. 385, 395, 68 S.Ct. 1156, 1162, 92 L.Ed. 1460 (1948). The Supreme Court has established that "one of the privileges which the clause guarantees to citizens of State A is that of doing business in State B on terms of substantial equality with the citizens of that State." *Toomer v. Witsell, supra* at 396, 68 S.Ct. [1156] at 1162 cited in *Austin v. New Hampshire,* 420 U.S. 656, 663 n. 9, 95 S.Ct. 1191, 43 L.Ed.2d 530 (1975).

**21.** *Kreitzer* involved an unsuccessful attack upon the constitutionality of a local rule of the U. S. District Court for the District of Puerto Rico requiring nonresident party plaintiffs to post bond. The Court stated (at 507):

The [art. IV, § 2, privileges and immunities] clause . . . establishes a norm of comity without specifying the particular subjects as to which citizens of one state coming within the jurisdiction of another are guaranteed equality of treatment. *Austin v. State of New Hampshire,* 420 U.S. 656, 95 S.Ct. 1191, 43 L.Ed.2d 530, 43 L. W. 4400 (1975). During the pre-constitutional period, the practice of some states denying to outlanders the treatment that its citizens demanded for themselves was widespread. The primary purpose of this clause, like the clauses between which it is located—those relating to full faith and credit and to interstate extradition of fugitives from justice—was to help fuse in one Nation a collection of independent, sovereign states. Like many other constitutional provisions, the privileges and immunities clause *is not absolute.* It does bar discrimination against citizens of other states where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other states. But it does not preclude disparity of treatment in the many situations where there are perfectly valid independent reasons for it. Thus the inquiry in each case must be concerned with whether such reasons do exist and whether the degree of discrimination bears a close relation to them. *Toomer v. Witsell,* 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed.2d 1460 (1948). [Emphasis in original.]

**22.** In *Kreitzer,* the Court also stated (417 F.Supp. at 507):

It is settled that absolute equality is not a requisite under the Privileges and Immunities Clause. We understand that the same reasons we gave to sustain that Rule 6 does not violate the Equal Protection Clause of the Constitution, serve as valid reasons to decide that this Court's rule is not an invidious discrimination in violation of the Privileges and Immunities Clause.

*See also Consumers Union,* 427 F.Supp. at 845–46.

merit. *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), in no way suggests to the contrary. Therein, the Supreme Court unanimously held that a Fairfax County, Virginia minimum fee schedule violated the Sherman Act. However, in concluding his opinion, Mr. Chief Justice Burger wrote (at 792–93, 95 S.Ct. at 2016):

> We recognize that the States have a compelling interest in the practice of professions within their boundaries, and that as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for licensing practitioners and regulating the practice of professions. We also recognize that in some instances the State may decide that "forms of competition usual in the business world may be demoralizing to the ethical standards of a profession." [Citations omitted.] The interest of the States in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice, and have historically been "officers of the courts." [Citations omitted.] In holding that certain anticompetitive conduct by lawyers is within the reach of the Sherman Act we intend no diminution of the authority of the State to regulate its professions.[23]

Judge Russell's comments with regard to "right to travel" in *Hawkins,* (503 F.2d at 1178–79), in the context of a number of constitutional attacks (including equal protection and privileges and immunities),[24] are also applicable at this point in this opinion. Thereat, Judge Russell wrote:

> The right of federal citizenship as reflected in the "right to travel" and as protected by this provision is not to be construed to mean that a citizen carries with him from state to state an absolute right of comity to practice, not a "common occupation", but a profession, which is properly subject to state regulation, in any state to which he travels, though this is essentially what the plaintiff, in the exposition of this contention, posits. The exercise by a state of power to regulate reasonably the practice of law within its jurisdiction and to require of any applicant, whether a resident or a migrant, that he demonstrate sufficient proficiency in the law as a prerequisite to a license to practice, is, as we have seen perfectly permissible and represents no violation of this provision of the Fourteenth Amendment. *Kovrak v. Ginsburg, et al., Members of the Committee on Unauthorized Practice of Law,* (1958) 392 Pa. 143, 139 A.2d 889, app. dis. 358 U.S. 52, 79 S.Ct. 95, 3 L.Ed.2d 46; *West Virginia State Bar v. Earley, supra* (144 W.Va. 504, 109 S.E.2d 420); *State v. Rosenkrans* (1910) 30 R.I. 374, 75 A. 491, aff. 225 U.S. 698, 82 S.Ct. 846, 56 L.Ed. 1263. That regulations dealing with qualifications to practice a profession such as law or medicine are without what has been described as the "parameters of the *Shapiro* penalty analysis" follows, at least inferentially, from the language of the court in *Memorial Hospital v. Maricopa County* (1974) 415 U.S. 250, 259, 94 S.Ct. 1076, 39 L.Ed.2d

---

**23.** *See also* Mr. Justice Powell's stress in *Raymond Motor Transp., Inc. v. Rice,* 434 U.S. 429, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978), as to the need for recognition of local and state interests in the consideration of commerce clause attacks upon state regulation. In *Raymond Motor,* the Court invalidated certain Wisconsin restrictions upon the length of trucks operating on that state's highways because they substantially burdened interstate commerce without sufficiently contributing to local highway safety. In this case, the state needs embodied in Maryland Rule 10 far outweigh the effect, if any, of that rule on interstate commerce. Thus, the following comment of Mr. Justice Powell (98 S.Ct. at 793) is applicable herein:

"[I]t never has been doubted that much state legislation, designed to serve legitimate state interests and applied without discrimination against interstate commerce, does not violate the Commerce Clause even though it affects commerce."

**24.** "We have no occasion to ascribe the source of this right to travel interstate to a particular constitutional provision." *Shapiro v. Thompson,* 394 U.S. 618, 630, 89 S.Ct. 1322, 1329, 22 L.Ed.2d 600 (1969). In note 8 thereto, the two privileges and immunities clauses, the commerce clause and the due process clause are all mentioned.

306, a case relied on by the appellant in argument in this Court. In that case, the Court made it clear that every state requirement that impinges to some extent on the right to travel is not *"per se* unconstitutional"*.* (Page 256, 94 S.Ct. 1076) And, to give point to that language, the Court again cautioned, as it had done in *Shapiro,* "that it meant to 'imply no view of the validity of waiting-period or residence requirements determining eligibility [inter alia] to obtain a license to practice a profession, to hunt or fish, and so forth.'" (Page 259, n. 13, 94 S.Ct. p. 1082). What is true of a residence requirement, as applied to the licensing of an applicant for the practice of a profession, is even more so of a requirement for the establishment of professional competency *via* a written examination. Indeed, the validity of the residence requirement has often been sustained only as an incident to the procedure for determining the competency of a migrant seeking professional licensing in a state. [Footnote omitted.]

For the reasons set forth herein, summary judgment for defendants will be granted.